# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SMIRK & DAGGER GAMES, a sole
proprietorship of Curt Covert,
30 Lyrical Lane
Sandy Hook, CT 06482;

B. STUYVESANT CHAMPAGNE, LLC,
63 Flushing Ave., BLDG 212
Brooklyn, NY 11205;

LEO D. BERNSTEIN & SONS INC. d/b/a/
BERNSTEIN DISPLAY
151 West 25th Street
New York, NY 10001;

                       *Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States,
1600 Pennsylvania Avenue NW,
Washington, DC 20500;

EXECUTIVE OFFICE OF THE
PRESIDENT,
1600 Pennsylvania Avenue NW,
Washington, DC 20500;

KRISTI NOEM, in her official capacity as
Secretary of the U.S. Department of
Homeland Security,
245 Murray Lane SW, Mail Stop 0485
Washington, DC 20528-0485;

U.S. DEPARTMENT OF HOMELAND
SECURITY,
245 Murray Lane SW, Mail Stop 0485
Washington, DC 20528-0485;

**CLASS ACTION COMPLAINT FOR
INJUNCTIVE AND DECLARATORY
RELIEF**

Case No. _____

RODNEY S. SCOTT, in his official capacity
as Commissioner for U.S. Customs and Border
Protection,
1300 Pennsylvania Avenue NW Washington,
DC 20229;

U.S. CUSTOMS AND BORDER
PROTECTION
1300 Pennsylvania Avenue NW Washington,
DC 20229;

SCOTT BESSENT, in his official capacity as
Secretary of the Treasury,
1500 Pennsylvania Avenue NW
Washington, DC 20220;

U.S. DEPARTMENT OF THE TREASURY,
1500 Pennsylvania Avenue NW
Washington, DC 20220;

HOWARD LUTNICK, in his official capacity
as Secretary of Commerce,
1401 Constitution Avenue NW Washington,
DC 20230;

U.S. DEPARTMENT OF
COMMERCE,
1401 Constitution Avenue NW
Washington, DC 20230,

*Defendants.*

Plaintiffs Smirk & Dagger Games, a sole proprietorship of Curt Covert, B. Stuyvesant

Champagne, LLC, and Leo D. Bernstein & Sons ("Bernstein Display") (collectively, "Plaintiffs")

allege as follows for their class-action Complaint against Defendants Donald J. Trump, in his

official capacity as President of the United States; Executive Office of the President; United States

of America; Kristi Noem, in her official capacity as Secretary of Homeland Security; U.S.

Department of Homeland Security; Rodney S. Scott, in his official capacity as Commissioner for

Customs and Border Protection; U.S. Customs and Border Protection; Scott Bessent, in his official

2

capacity as Secretary of the Treasury; U.S. Department of the Treasury; Howard Lutnick, in his official capacity as Secretary of Commerce; and the U.S. Department of Commerce.

## INTRODUCTION

1. Plaintiffs challenge President Trump's unlawful use of emergency power to impose a tariff on imports from virtually all of the United States' trading partners, and additional tariffs on China, Mexico, and Canada. The President ordered these tariffs in a series of Executive Orders he issued beginning on February 1, 2025. The President purported to order these tariffs under the International Emergency Economic Powers Act of 1977 ("IEEPA"), but that is a statute that authorizes presidents to order sanctions as a rapid response to international emergencies. It does not allow a president to impose tariffs on the American people. These Executive Orders (the "Tariff Executive Orders") are, therefore, *ultra vires* and unconstitutional. This Court should enjoin their implementation and enforcement. It also should vacate all resulting modifications made to the Harmonized Tariff Schedule of the United States ("HTSUS").

2. A tariff is a tax on Americans' commerce with other countries. The Constitution assigns Congress exclusive power to impose tariffs and regulate foreign commerce. Presidents can impose tariffs only when Congress grants permission, which it has done in carefully drawn trade statutes. These statutes typically authorize tariffs only on industries or countries that meet specified criteria, and only under specified conditions, after following specified procedures. Such statutes require advance investigations, detailed factual findings, and a close fit between the statutory authority and a tariff's scope.

3. President Trump unlawfully bypassed these constraints by invoking IEEPA. But in IEEPA's almost 50-year history, no previous president has used it to impose tariffs. Which is not

surprising, since the statute does not even mention tariffs, nor does it say anything else suggesting it authorizes presidents to tax American citizens.

4.      IEEPA does authorize asset freezes, trade embargoes, and similar economic sanctions. Presidents have used IEEPA to target dangerous foreign actors—primarily terrorist organizations and hostile countries such as Iran, Russia, and North Korea. Congress passed IEEPA to counter external emergencies, not to grant presidents a blank check to write domestic economic policy.

5.      Even if IEEPA permitted tariffs in some cases—which it does not—it still would not permit them here. IEEPA limits presidents to actions that are "necessary" to address the specific emergency at hand. Here, President Trump declared emergencies because of illegal opioids entering the United States and because of trade deficits. But the Tariff Executive Orders show no connection between these problems and the tariffs he ordered—much less that the tariffs are "necessary" to resolve those problems. The means of across-the-board tariffs do not fit the ends of stopping an influx of opioids or ending trade deficits and is in no sense "necessary" to those stated purposes. While the "emergencies" the President has declared are not challenged here, the "fit" of the tariffs to the declared emergencies does not meet the requirements of IEEPA.

6.      If the President is permitted to use IEEPA to bypass the statutory schemes for tariffs, the President will have nearly unlimited authority to commandeer Congress's power over tariffs. He would be empowered to declare a national emergency based on any long-running national problem, then impose tariffs purportedly in the name of that emergency—thus sidestepping the detailed constraints Congress has placed on the tariff authority it has granted. The events of the past year bear this out.

7.      The tariffs imposed by the Tariff Executive Orders will greatly damage Plaintiffs, which are small businesses that import material from China and the European Union, countries covered by the Tariff Executive Orders. The Tariff Executive Orders have or will impose significant additional costs on Plaintiffs. If Plaintiffs can and do shift their purchasing to other countries, they will be forced to incur still further costs. The Tariff Executive Orders are forcing Plaintiffs to attempt to adjust by some combination of raising their prices to their customers, losing customers and customer relationships, cutting costs, and suffering losses. These Tariff Executive Orders also deny Plaintiffs the protection the Constitution promised when it assigned Congress sole control of tariffs and the regulation of commerce with foreign nations.  They were also imposed so quickly as to exclude any possibility of finding new suppliers. And they have made business planning nearly impossible.

8.      The Tariff Executive Orders and the resulting modifications to the HTSUS are unlawful for at least four reasons.

a.  First, the Tariff Executive Orders are *ultra vires* because IEEPA does not authorize a president to impose tariffs. Basic tools of statutory construction dictate this conclusion. The Supreme Court's major questions doctrine confirms it. Because the Executive Orders present a question of "vast economic and political significance," the major questions doctrine requires the President to show that IEEPA "clearly" authorizes him to impose tariffs. The President cannot make that showing.

b.  Second, the Tariff Executive Orders are *ultra vires* because the President has not—and cannot—meet IEEPA's requirement that he show the tariffs

are "necessary" to address the stated "emergencies" of illegal opioids and trade deficits.

c. Third, if IEEPA permits the Tariff Executive Orders, then this statute violates the nondelegation doctrine because it lacks an intelligible principle that constrains a president's authority. In that case, IEEPA is unconstitutional because it delegates Congress's prerogative to tax and to regulate commerce with foreign nations.

d. Fourth, the resulting modifications made to the HTSUS violate the Administrative Procedure Act because they are contrary to law. The Department of Homeland Security, acting primarily through U.S. Customs and Border Protection, made these modifications to comply with the Tariff Executive Orders. But for the reasons just noted, those Order are themselves unlawful, making the resulting HTSUS modifications contrary to law.

9.    Accordingly, Plaintiffs ask the Court to declare the Tariff Executive Orders and the related HTSUS modifications unlawful and unconstitutional; vacate the Tariff Executive Orders; enjoin Defendants Executive Office of the President, Noem, U.S. Department of Homeland Security, Scott, U.S. Customs and Border Protection, Bessent, U.S. Department of the Treasury, Lutnick, and U.S. Department of Commerce  from implementing or enforcing the Tariff Executive Orders and the HTSUS modifications; and to set aside the implementing modifications to the tariff schedule.

## JURISDICTION AND VENUE

10.    The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the United States Constitution, the International Emergency Economic Powers Act

("IEEPA"), 50 U.S.C. §§ 1701 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*

11.    The Court has authority to grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the Administrative Procedure Act, 5 U.S.C. § 702; and the Court's inherent equitable powers.

12.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1), because Defendants are officers or employees of agencies of the United States acting in their official capacities and a substantial part of the events or omissions giving rise to this action occurred in this District.

## THE PARTIES

13.    Smirk & Dagger Games is a sole proprietorship owned by Curt Covert. It is a family-run board game company with its principal place of business in Sandy Hook, Connecticut. Smirk & Dagger primarily imports its products from China, it has imported products from China since the Tariff Executive Orders began on February 4, 2025, and it has paid increased tariffs because of the Tariff Executive Orders. In response to the Tariff Executive Orders, Smirk & Dagger has both raised prices and cut its own profit margins. Moreover, the Tariff Executive Orders have forced the company to delay production and import of various goods essential to its business. It is impossible for Smirk & Dagger to onshore its business. Many of the parts necessary for its board games cannot be manufactured in the United States. And where alternatives exist, those alternatives are prohibitively expensive Smirk & Dagger Games is a class representative for the putative China Tariff Class described below.

14.    B. Stuyvesant Champagne, LLC, is a New York domestic limited liability company with its principal place of business in New York City. Stuyvesant imports champagne from France and operates a Brooklyn-based tasting room. Stuyvesant has partnered with a vineyard in France,

and it imports and sells its own champagne. The company has imported products from France since the Reciprocal Tariffs began on April 5, 2025, and it has thus paid increased tariffs on its imports from France. Moreover, to deal with the cost of the tariffs, Stuyvesant has increased prices, decreased production, delayed imports of items essential to its business from China, and considered reducing holiday bonuses for its employees. Stuyvesant has also lost customers and business partners due to the tariffs. The company will continue to pay higher tariffs and suffer economic injuries because of the Tariff Executive Orders. B. Stuyvesant Champagne, LLC is the class representative for the putative European Union Tariff Class described below.

15.    Leo D. Bernstein & Sons Inc. d/b/a Bernstein Display is a New York domestic business corporation with its principal place of business in New York City. It manufactures and sells mannequins and an assortment of other storefront display items, including fixtures and furniture. The company primarily imports from China and has paid increased tariffs since February 4, 2025, because of the Tariff Executive Orders. The company will continue to pay higher tariffs and suffer economic injuries, including lost profits, as a result of the Tariff Executive Orders. Bernstein Display has explored manufacturing and sourcing its products domestically, but it would be unable to remain competitive if it did so. Bernstein Display is a representative of the China putative Tariff Class described below.

16.    Defendant Donald J. Trump is the President of the United States and is sued in his official capacity. President Trump issued the Tariff Executive Orders, purportedly acting under authority of IEEPA, 50 U.S.C. § 1701 *et seq.*, and the National Emergencies Act ("NEA"), 50 U.S.C. § 1601 *et seq.*

17.    Defendant Executive Office of the President is a federal agency headquartered in Washington, D.C.

18.    Defendant Kristi Noem is the Secretary of Homeland Security and is sued in her official capacity. The Tariff Executive Orders tasked Secretary Noem with implementing the Tariff Executive Orders by modifying the HTSUS.

19.    Defendant U.S. Department of Homeland Security is a federal agency headquartered in Washington, D.C.

20.    Defendant Rodney S. Scott is the Commissioner for U.S. Customs and Border Protection. U.S. Customs and Border Protection implemented modifications to the HTSUS to comply with the Tariff Executive Orders. This agency also performs critical functions to collect tariff payments, including payments for the China and other tariffs challenged in this lawsuit.

21.    Defendant U.S. Customs and Border Protection is a federal agency headquartered in Washington, D.C.

22.    Defendant Scott Bessent is the Secretary of the Treasury and is sued in his official capacity. The Tariff Executive Orders tasked Secretary Bessent with taking any necessary actions to implement the Orders.

23.    Defendant U.S. Department of the Treasury is a federal agency headquartered in Washington, D.C.

24.    Defendant Howard Lutnick is the Secretary of Commerce and is sued in his official capacity. The Tariff Executive Orders tasked Secretary Lutnick with taking any necessary actions to implement the Orders.

25.    Defendant U.S. Department of Commerce is a federal agency headquartered in Washington, D.C.

## FACTUAL ALLEGATIONS

**The President's Authority Under Tariff Statutes**

26.     The U.S. Constitution assigns Congress the sole power to legislate, regulate foreign commerce, and impose tariffs. U.S. Const. art. I, § 8. President Trump can impose tariffs only to the extent Congress has expressly allowed him to do so.

27.     Until the President ordered the tariffs at issue here, presidents imposing tariffs had relied on authority Congress has delegated in trade statutes. Those statutes are all located and codified in the "Customs Duties" Title of the United States Code. *See* U.S. Code Title 19.

28.     During President Trump's first term, for example, his Administration imposed tariffs on imports from China by complying with Section 301 of the Trade Act of 1974 (known as the "Unilateral Trade Sanctions" provision), which authorizes tariffs on countries that have violated certain trade agreements. *See* 19 U.S.C. § 2411; USTR, *President Trump Announces Strong Actions to Address China's Unfair Trade* (Mar. 22, 2018), https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/march/president-trump-announces-strong.

29.     The first Trump Administration imposed tariffs on steel and aluminum under authority granted by another tariff statute, Section 232 of the Trade Expansion Act (the "National Security Provision"). *See* 19 U.S.C. § 1862; Proclamation 9704 (March 8, 2018), 83 FR 11619 (Mar. 15, 2018). As this statute permits, the Administration imposed tariffs to protect the domestic steel and aluminum industries and, in turn, national security.

30.     That Administration also imposed tariffs on solar cells and washing machines, this time under Section 201 of the Trade Act of 1974 (the "Global Safeguard Provision"). In this provision, Congress authorized tariffs to provide temporary relief to industries while they adjust to foreign competition. 19 U.S.C. § 2251; USTR, *President Trump Approves Relief for U.S.*

10

*Washing Machine and Solar Cell Manufacturers* (Jan. 22, 2018), https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/january/president-trump-approves-relief-us.

31.    These trade statutes all require the Executive Branch to follow specific procedures before imposing a tariff. For example, Section 301 of the Trade Act of 1974, 19 U.S.C. §§ 2411-2420, required the U.S. Trade Representative to navigate a multi-step administrative process: Publish a Federal Register request for public comment on the proposed tariffs; conduct a factual investigation into China's trade practices; conduct a public hearing on the matter; then issue a detailed report. To meet the statutory requirements for a tariff, the report had to contain factual findings showing that China's trade practices did violate trade agreements. *See* 19 U.S.C. §§ 2411(a)–(c), 2414; USTR, *Findings of the Investigation Into China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation Under Section 301 of The Trade Act of 1974* (Mar. 22, 2018), https://ustr.gov/sites/default/files/Section%20301%20FINAL.PDF. If the U.S. Trade Representative had not found facts establishing that conclusion, the statute would not have permitted the Administration to impose the tariffs.

32.    Performing the required procedures for the 2018 China Tariff took more than 10 months.  The procedures for the steel and aluminum tariffs took eleven months. U.S. Department of Commerce, *Section 232 Investigation on the Effect of Imports of Steel on U.S. National Security* (Mar, 18, 2018), https://www.commerce.gov/issues/trade-enforcement/section-232-steel. And the procedures for the washer and solar cell tariffs took more than eight months. USTR Fact Sheet, *Section 201 Cases: Imported Large Residential Washing Machines and Imported Solar Cells and Modules* (Jan. 22, 2018) (addressing washer and solar-cell tariffs), https://ustr.gov/sites/default/files/files/Press/fs/201%20Cases%20Fact%20Sheet.pdf.

**The President's Authority Under IEEPA**

33.    When President Trump began his second term, he chose to bypass these tariff statutes. Instead of again relying on the "Customs Duties" Title, U.S. Code Title 19, he turned to a different part of the U.S. Code, "War and National Defense," U.S. Code Title 50. This Title contains IEEPA. 50 U.S.C. §§ 1701–1706.

34.    IEEPA authorizes a president to respond to a foreign threat by declaring a national emergency, then ordering one or more of the economic responses the statute describes. 50 U.S.C. § 1702(a). The statute defines an emergency as "an unusual and extraordinary threat, which has its source … outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). IEEPA provides that, after declaring a national emergency, a president can order a responsive action if it meets two requirements. First, the action must be included in IEEPA's list of permissible actions, such as freezing assets and blocking international transactions. 50 U.S.C. § 1702(a)(1)(A), (B). Second, the specific action must be "necessary" to address the specific declared emergency. 50 U.S.C. § 1703(b)(4).

35.    Consistent with these limitations, presidents have cited IEEPA to impose economic sanctions such as import bans and asset freezes. Christopher A. Casey and Jennifer K. Elsea, CONG. RSCH. SERV., R45618, *The International Emergency Economic Powers Act: Origins, Evolution, and Use* 25–26 (2024). For a history of sanctions under IEEPA, *see id.* at App. A.  Typical targets of the sanctions have been foreign governments, foreign political parties, and terrorist organizations. *Id*. at 22. In limited instances presidents have cited IEEPA against domestic targets, but those typically have been specific wrongdoers such as "Persons Who Commit, Threaten to Commit, or Support Terrorism." *See, e.g.*, Exec. Order No. 13,224, *Blocking Property and*

*Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism*, 66 Fed. Reg. 49,079 (September 23, 2001).

36.    President Trump has previously cited IEEPA to impose sanctions. In 2019, for example, he invoked it to freeze the assets of the main Venezuelan state-owned oil company. Exec. Order No. 13,857, *Taking Additional Steps to Address the National Emergency with Respect to Venezuela*, 84 Fed. Reg. 509 (Jan. 25, 2019); *Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A.*, U.S. Department of the Treasury (Jan. 28, 2019), https://home.treasury.gov/news/press-releases/sm594. Like President Trump during his first term, other presidents have used IEEPA to impose consequences on America's foes, not taxes on American citizens.

**The Executive Orders Imposing Tariffs Under IEEPA**

37.    That changed when President Trump took office for his second term. On Inauguration Day, January 20, 2025, he took the first step to using IEEPA to impose tariffs. He issued a Proclamation declaring an emergency at the U.S.-Mexican border, emphasizing the threat from cartels, other illegal actors, and illegal drugs. His Proclamation stated that the Mexican border was "overrun by cartels, criminal gangs, known terrorists, human traffickers, smugglers, unvetted military-age males from foreign adversaries, and illicit narcotics that harm Americans." Proclamation No. 10886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8,327 (Jan. 20, 2025). This emergency declaration was a basis of the Executive Order imposing tariffs on Mexican products, which as explained below, the President issued 12 days later.

38.    Also on Inauguration Day, the President issued a separate "Memorandum" on trade issues, titled "America First Trade Policy." Memorandum from President Trump to the Secretary

of State, *et al.*, *America First Trade Policy*, 90 Fed. Reg. 8,471 (Jan. 20, 2025). It directed key agencies to review existing tariffs and other trade measures to "Address[] Unfair and Unbalanced Trade." It discussed "our country's large and persistent annual trade deficits" and referred to a possible "global supplemental tariff … to remedy" the trade deficits. *Id.* § 2. It discussed the revenue the United States can raise through tariffs. *Id.* § 2(b), (i). The Memorandum referred to only three countries: China, Canada, and Mexico. *Id.* §§ 3, 4(g).

**The Trafficking Tariffs**

39.     On February 1, 2025, President Trump issued three Executive Orders imposing tariffs on imports from Canada, Mexico, and China. Each cited IEEPA as authority.

40.     The Tariff Executive Orders also cited three other statutes for technical or administrative purposes but did not purport to rely on them for authority to order tariffs. The Tariff Executive Orders cited the National Emergencies Act, which provides the general framework for declarations of national emergencies but explicitly disclaims granting substantive authority, *see* 50 U.S.C. § 1641; section 604 of the Trade Act of 1974, which is a ministerial statute directing the President to update HTSUS to reflect changes in tariff laws, 19 U.S.C. § 2483; and 3 U.S.C. § 301, which authorizes the President to delegate functions to subordinate officials.

41.     The Mexico Executive Order cited the emergency declared on Inauguration Day and imposed a 25% tariff on all imports. *See* Exec. Order No. 14,194, *Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117 (Feb. 1, 2025). The Canada Executive Order declared an emergency because of opioid trafficking, and also imposed a 25% tariff, with certain exceptions. *See* Exec. Order No. 14,193, *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9,113 (Feb. 1, 2025); *id.* at 9,183 (listing exceptions). Before these new tariffs, tariffs on goods from Canada and Mexico had been near

zero. M. Angeles Villarreal, The United States-Mexico-Canada Agreement (USMC), CONG. RSCH. SERV. 3 (May 29, 2024) ("NAFTA's market-opening provisions gradually eliminated nearly all tariff and most nontariff barriers on goods and services produced and traded within North America."),

https://www.congress.gov/crsproduct/R44981?q=%7B%22search%22%3A%22USMCA+tariffs+tariff%22%7D&s=3&r=4.

42.     The China Executive Order also declared an emergency because of opioid trafficking. *See* Exec. Order 14,195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 1, 2025). It imposed an incremental tariff of 10%, effective February 4, 2025. *Id*.; Karen M. Sutter, *U.S.-China Tariff Actions Since 2018: An Overview*, CONG. RSCH. SERV. (July 10, 2025) (in 2023, average tariff rate on imports from China was about 19%), https://www.congress.gov/crs-product/IF12990. The Department of Homeland Security and Customs and Border Protection modified the HTSUS accordingly. *See Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,038 (Feb. 5, 2025).

43.     On February 3, the President delayed the effective date of the Canada and Mexico tariffs for one month. Exec. Order No. 14,197, *Progress on the Situation at Our Northern Border*, 90 Fed. Reg. 9,183 (Feb. 3, 2025); Exec. Order No. 14,198, *Progress on the Situation at Our Southern Border*, 90 Fed. Reg. 9,185 (Feb. 3, 2025).

44.     On March 3, 2025, the President doubled the incremental China tariff to 20%. Exec. Order No. 14,228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in*

*the People's Republic of China*, 90 Fed. Reg. 11,463 (Mar. 3, 2025). *See* U.S. Customs and Border Control Notice, 90 Fed. Reg. 11,426 (Mar. 6, 2025) (publishing revision to the HTSUS).

45.     On March 4, 2025, the Canada and Mexico tariffs became effective, with U.S. Customs and Border Protection implementing them through modifications of the HTSUS. U.S. Customs and Border Protection Notice, 90 Fed. Reg. 11,743 (Mar. 11, 2025) (modification of the HTSUS for products of Canada); U.S. Customs and Border Protection Notice, 90 Fed. Reg. 11,429 (Mar. 6, 2025) (modification of the HTSUS for products of Mexico). Also that day, President Trump announced an additional one-month pause on tariffs on items that were covered by the United States-Mexico-Canada Agreement, a 2020 trade agreement. Exec. Order No. 14,231, *Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11,785 (March 6, 2025); Exec. Order No. 14,232, *Amendment to Duties to Address the Flow of Illicit Drugs Across Our Southern Border*, 90 Fed. Reg. 11,787 (March 6, 2025).

46.     On July 31, 2025, the President increased the rate of tariffs on Canadian imports to 35%. Executive Order No. 14,325, *Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 37,957 (July 31, 2025).

47.     The President announced on November 1, 2025, that the IEEPA tariff rate for the trafficking tariff will be reduced to 10% on products from China effective November 10, 2025. The White House, *Fact Sheet: President Donald J. Trump Strikes Deal on Economic and Trade Relations with China* (Nov. 1, 2025), https://www.whitehouse.gov/fact-sheets/2025/11/fact-sheet-president-donald-j-trump-strikes-deal-on-economic-and-trade-relations-with-china/.

**The Reciprocal Tariffs**

48.     On April 2, 2025, the President declared "Liberation Day" and imposed what he deemed "reciprocal" tariffs. Exec. Order No. 14,257, *Regulating Imports with a Reciprocal Tariff*

*to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 2, 2025). The Executive Order declared a new national emergency based on "large and persistent annual U.S. goods trade deficits." *Id*. The Order expanded the President's tariff campaign, imposing a reciprocal tariff of at least 10% on imports from "all trading partners," including countries like France (a member of the European Union), while also imposing higher, country-specific reciprocal tariffs on imports from 57 trading partners. *Id*. at 15,045, 15,047, 15,049-50. The President again cited IEEPA as authority. *Id*. at 15,048.

49.    The reciprocal tariffs included a country-specific 34% reciprocal tariff on China. *Id*. at 15,049. This reciprocal tariff is in addition to the across-the-board trafficking tariffs described above. *Id*. at 15,047. The President issued two more Executive Orders raising the reciprocal tariff on imports from China, ultimately to 125%. *See* Exec. Order 14,259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports from the People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 8, 2025) (increasing the reciprocal tariff on Chinese goods to 84%); Exec. Order No. 14,266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15,625, 15,626 (Apr. 9, 2025) (increasing reciprocal tariff on Chinese goods to 125%).

50.    On May 12, 2025, after negotiations with China, President Trump temporarily decreased the reciprocal tariff on Chinese goods to 10% for a period of 90 days. Exec. Order No. 14,298, *Modifying Reciprocal Tariff Rates to Reflect Discussions with the People's Republic of China*, 90 Fed. Reg. 21,831 (May 12, 2025) (effective May 14, 2025). The Order modifies the HTSUS accordingly. *Id*. at 21,833. That suspension was set to expire on August 12, 2025. *Id*. at 21,832. But on August 11, the President extended that pause until November 10, 2025. Exec. Order

No. 14,334, *Further Modifying Reciprocal Tariff Rates To Reflect Ongoing Discussions With the People's Republic of China*, 90 Fed. Reg. 39,305 at § 2 (Aug. 11, 2025).

51.    All other country-specific reciprocal tariffs were initially suspended, so that only the 10% universal baseline tariff applies to the countries covered by the April 2, 2025 "Liberation Day" Executive Order. *See* Exec. Order No. 14,257, 90 Fed. Reg. 15,041. The administration set a goal to reach deals with most countries by July 9, 2025. *Id*. On July 6, 2025, the President extended that deadline to August 1, 2025. Exec. Order No. 14,316, *Extending the Modification of the Reciprocal Tariff Rates* (July 7, 2025), 90 Fed. Reg. 30,823 (July 7, 2025).

52.    On July 31, 2025, the President issued an Executive Order that ended the pause on the country-specific reciprocal tariffs. Exec. Order No. 14,326, *Further Modifying the Reciprocal Tariff Rates*, 90 Fed. Reg. 37,963 (July 31, 2025).

53.    On October 10, 2025, the President suggested he might impose an additional 100% tariff on China. Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Oct. 10, 2025, at 4:50 PM), https://truthsocial.com/@realDonaldTrump/posts/115351840469973590. According to the President, this tariff would be assessed *on top of* the preexisting trafficking and reciprocal tariffs on China. *Id.* At the time of this filing, the President has not issued an executive order levying this tariff.

54.    On October 25, 2025, the President announced that he was increasing the tariff rate on products from Canada by 10% in response to an advertisement by the government of Ontario, Canada that included statements made by former President Ronald Reagan that were critical of tariffs. *See* Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Oct. 25, 2025, at 4:30 PM), https://truthsocial.com/@realDonaldTrump/posts/115436697060819133; *see also* Auzinea Bacon, *Trump says he's increasing tariffs on Canada by 10% after Ontario's Reagan ad*, CNN.com

(updated Oct. 25, 2025). At the time of this filing, the President has not issued an executive order levying this tariff.

55.    As of this filing, tariff rate for the trafficking tariffs is 20% on products from China. The tariff rate for reciprocal tariffs is 34% on products from China. And, the reciprocal tariff rate is generally 15% on products from the European Union.

<strong>CLASS ACTION ALLEGATIONS</strong>

56.    **Class Definitions.** Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated as a class action, pursuant to Federal Rule of Civil Procedure 23(b)(2) on behalf of the following classes:

**<u>The China Tariff Class</u>:**

All companies or individuals who have paid or become obligated to pay IEEPA tariffs because they have or are about to import products from China.

**<u>The European Union Tariff Class</u>:**

All companies who have paid or become obligated to pay IEEPA tariffs because they have or are about to import products from the European Union.

57.    Excluded from the Classes are any individual or entity who already filed suit challenging the legality of the IEEPA tariffs. Plaintiffs reserve the right to modify or amend the Class definitions, as appropriate, during the course of this litigation.

58.    Because this suit is being brought as a class action, references to Plaintiffs should be construed to apply to all class members, even where not explicitly stated.

59.    This action is well suited to class treatment, and the classes as defined meet all applicable conditions for class treatment.

60.    **Numerosity**. The members of the Classes are so numerous and geographically dispersed that individual joinder of all members is impracticable. The exact size of the Classes is

unknown, but each likely includes thousands of members. In 2023, the Census Bureau identified 242,515 companies that imported goods from any source abroad. United States Census Bureau, *A Profile of U.S. Importing and Exporting Companies, 2022-2023*, at 4 (April 3, 2023), https://www.census.gov/foreign-trade/Press-Release/edb/edbrel2023.pdf. China, Mexico, and Canada, each of which are tariffed under the present IEEPA tariffs, were the "top three trading partners." *Id.*

61.    **Commonality**. There are multiple questions of law common to each Class, including but not limited to:

a.  Whether the Tariff Executive Orders are *ultra vires* because IEEPA does not authorize a president to impose tariffs;

b.  Whether the major questions doctrine requires the President to show that IEEPA "clearly" authorizes him to impose the Trafficking and Reciprocal Tariffs;

c.  Whether the Tariff Executive Orders are *ultra vires* because the President has not met IEEPA's requirement that he show the tariffs are "necessary" to address the stated "emergencies" of illegal opioids and trade deficits;

d.  Whether, if IEEPA permits the Tariff Executive Orders, the statute violates the nondelegation doctrine because it lacks an intelligible principle that constrains the President's authority;

e.  Whether the resulting modifications made to the HTSUS violate the Administrative Procedure Act because they are contrary to law; and

f.  Whether Plaintiffs are entitled to the relief described in the Prayer for Relief.

62.    At bottom, the members of the Classes all suffer from the same alleged injury, the President's use of IEEPA to impose tariffs and the Defendants' implementation of such tariffs. The President's actions are a uniform policy or practice that affects all class members.

63.    Given the common questions of law, any factual variation among members of the Classes is insufficient to defeat Rule 23(a)(2)'s permissive standard.

64.    **Typicality**. Each class representative's claims are typical of its Class, because the representative has imported products from the respective country(ies) tariffed under IEEPA and paid the associated tariff duties. As a result, the typicality requirement of Fed. R. Civ. P. 23(a)(3) is met here. Defendants also treat all members of the Classes the same—or substantially the same—as to the applicable allegations and claims made herein. This makes the claims typical of the Classes in that respect.

65.    **Adequacy of Representation**. Each class representative will fairly and adequately protect the interests of its class members. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Classes. Additionally, Plaintiffs seek identical declaratory and injunctive relief that would benefit all putative members of the Classes. Plaintiffs have also retained counsel competent and experienced in the prosecution of class-action litigation to represent themselves and the class. Each plaintiff is willing to fully participate in the litigation and direct class counsel. The adequacy-of-representation requirement of Fed. R. Civ. P. 23(a)(4) is thus met here.

66.    **Fed. R. Civ. P. 23(b)(2) Class Type**. Certification for injunctive and declaratory relief is appropriate under Rule 23(b)(2) because Defendants have acted in a manner generally applicable to the Classes, such that preliminary and final injunctive relief, and corresponding declaratory relief, are appropriate to the Classes. Fed. R. Civ. P. 23(b)(2).

67.    **Class Action Superiority & Efficiency**. Though not necessary for a 23(b)(2) class action, class-wide treatment of the common issues presented by this suit against Defendants in a single forum represents a means of determining Defendants' legal obligations to each Class member that is superior to a large number of individual lawsuits. As a result, class-wide adjudication of Defendants' liability followed by the grant of undifferentiated declaratory and injunctive relief is the most efficient means of adjudication.

## CLAIMS FOR RELIEF

### COUNT I
**(Defendants President Trump and Executive Office of the President)**
**Presidential Order in Excess of Statutory Authority:**
**IEEPA Does Not Authorize Tariffs**

68.    Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

69.    The tariffs ordered in the Tariff Executive Orders must be supported by clear and explicit congressional authorization. They are not, because IEEPA does not authorize a president to impose tariffs.

70.    When this Court interprets the text of IEEPA to determine whether it authorizes tariffs, the Court must "determine the best reading" of IEEPA, without deferring to the Executive Branch's proposed interpretation. *Loper Bright Enterprises v. Raimondo* and *Relentless v. Dep't of Commerce*, 603 U.S. 369, 400 (2024). That legal question—whether IEEPA authorizes tariffs— does not involve determining whether an emergency exists. Nor does it involve making any judgments about national security.

71.    The Supreme Court has warned against finding new authority in decades-old statutes. *See, e.g.*, *Util. Air Regul. Group* (*UARG*) v. *EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant

portion of the American economy' … we typically greet its announcement with a measure of skepticism.") (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).

72.     In the 48 years since Congress enacted IEEPA—years that cover eight presidents—no president other than President Trump has cited it to impose tariffs.

73.     That history is consistent with IEEPA's text, because the text does not authorize a president to require Americans to pay tariffs. *See* 50 U.S.C. § 1702(a)(1)(A), (B).

74.     Moreover, tariffs differ in kind from the actions IEEPA authorizes. None of the authorized emergency actions involves imposing a tax on American citizens and residents. *See* 50 U.S.C. § 1702(a)(1)(A), (B).

75.     The absence in IEEPA of any authority to impose tariffs contrasts with the text of tariff statutes, which expressly refer to duties or tariffs. For example, Section 301 of the Trade Act of 1974 authorizes the president to "impose *duties* or other import restrictions." 19 U.S.C. § 2411(c)(1)(B) (emphasis added). Likewise, Section 201 of the Trade Act of 1974 authorizes the president to "proclaim an increase in, or the imposition of, any *duty* on the imported article" or "proclaim a *tariff*-rate quota on the article." 19 U.S.C. §2251(a)(3)(A), (B) (emphasis added). And Section 232 of the Trade Expansion Act refers to authority to change the level of "*duties*" on imports, 19 U.S.C. § 1862(a) (emphasis added), and to "adjust the imports," 19 U.S.C. § 1862(c).

76.     Basic principles of statutory construction establish that IEEPA does not authorize the president to impose tariffs on Americans. This conclusion is reinforced by the major questions doctrine, which presumes that Congress "speak[s] clearly" if it authorizes the Executive Branch to make "decisions of vast 'economic and political significance.'" *UARG*, 573 U.S. at 324; *accord West Virginia v. EPA*, 597 U.S. 697, 716 (2022). Such a decision occurs when a president imposes heavy across-the-board tariffs. In 2024, United States imports totaled at least $3.36 trillion. Trade

Statistics, U.S. Customs and Border Protection, https://www.cbp.gov/newsroom/stats/trade. The current Administration estimates that the Tariff Executive Orders will generate up to $600 billion in tariffs each year. Richard Rubin, *Bessent Says Tariff Revenue Could Reach $600 Billion Annually*, WALL ST. J. (Apr. 4, 2025), https://www.wsj.com/livecoverage/stock-market-tariffs-trade-war-04-04-2025/card/bessent-says-tariff-revenue-could-reach-600-billion-annually-QJfDGCPYDY1C72Ljg1pt; *see also Fact Sheet: President Donald J. Trump Declares National Emergency to Increase Our Competitive Edge, Protect Our Sovereignty, and Strengthen Our National and Economic Security*, The White House (Apr. 2, 2025), White House Fact Sheet.

77.    Because IEEPA does not authorize a president to impose tariffs, the Tariff Executive Orders are *ultra vires*, lying outside the bounds of the authority Congress delegated to the president. And because the Tariff Executive Orders are unlawful, the HTSUS modifications made in reliance on them also are unlawful.

78.    The President's *ultra vires* Executive Orders and the modifications to the HTSUS have caused and will continue to cause irreparable harm to Plaintiffs.

**COUNT II**
**(Defendants President Trump and Executive Office of the President)**
***Ultra Vires* Executive Orders**
**The President Has Not Shown That the Tariff Executive Orders**
**Are "Necessary" to Address the Stated Emergencies**

79.    Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

80.    IEEPA requires a president to establish that the emergency actions he takes are "*necessary*" to address the specific emergency he declared. 50 U.S.C. § 1703(b)(4) (emphasis added). Likewise, it mandates that "[t]he authorities granted to the President … may *only* be exercised *to deal with* an unusual and extraordinary threat with respect to which a *national*

24

*emergency* has been declared." 50 U.S.C. § 1701(b) (emphases added). *See also id*. § 1701(a) (limiting the president's authority to actions "to deal with" the emergency). IEEPA requires presidents to use the powers granted only for the emergency, specifying that authority under IEEPA "may not be exercised for any other purpose." *Id*. § 1701(b).

81.    The President's broad tariffs—described by one economist as a strategy of "flipping over the gameboard and scattering the pieces," Oren Cass, *O Canada! Time to Talk Tariffs*, Understanding America (Feb. 3, 2025), https://www.understandingamerica.co/p/o-canada-time-to-talk-tariffs—do not meet the requirement that the specific emergency action be "necessary" to address the specific (opioid and trade deficits) problems. 50 U.S.C. § 1703(b)(4).

82.    The required "necessary" connection does not exist between the opioid problem and the tariff imposed on China on February 1, 2025, in E.O. 14,195, and increased on March 3, 2025, E.O. 14,228. The opioid problem is not a trade problem at all (given that what is being imported is in many cases an illegal substance), much less a trade "emergency."

83.    Likewise, the required "necessary" connection does not exist between the reciprocal tariffs and the trade deficit. The calculations of the reciprocal tariffs are arbitrary, having no connection to the trade deficit and no economic or other basis.

84.    Nor do any of the Tariff Executive Orders make the required showing that the president ordered the tariffs "*only* … to deal with" the "national emergency" he declared. 50 U.S.C. § 1701(b) (emphasis added).

85.    To the contrary, other presidential statements show that the Executive Orders imposed the tariff for a different or additional purpose: to lower the United States trade deficit and raise revenue.

86. Those statements allow the Court to determine whether the stated reason for the President's action is the actual reason. *See Dep't of Com. v. New York*, 588 U.S. 752, 782 (2019) (remanding to the agency where the evidence did not match the secretary's explanation of his decision).

87. For example, as described above, the Inauguration Day Memorandum, "America First Trade Policy," discussed "our country's large and persistent annual trade deficits" and a possible "global supplemental tariff." The Memorandum discusses Mexico, Canada, and China, but not other countries.

88. The following week, a day before the President issued the first Executive Order imposing a tariff on China, he discussed imposing universal tariffs on all products from China, Canada, and Mexico. Explaining the reason for these tariffs, he stated, "It's pure economic." He added, "We have big deficits with, as you know, with all three of them." Aime Williams, *et al.*, *Donald Trump threatens to ignite era of trade wars with new tariffs*, Financial Times (Jan. 31, 2025) (quoting President Trump), https://www.ft.com/content/ff8116f0-b01f-4687-934a-a1b8a07bd5b0.

89. Because the Tariff Executive Orders do not meet IEEPA's requirements that the action ordered be "necessary" to address the specific emergency, 50 U.S.C. §§ 1701, 1703(b)(4) & (5), and that the specific emergency be the "only" reason for the action ordered, 50 U.S.C. § 1701(b), the Tariff Executive Orders are *ultra vires* and unlawful. Because those Orders are unlawful, the HTSUS modifications made in reliance on them also are unlawful.

90. The President's *ultra vires* actions and the modifications to the HTSUS have caused and will continue to cause irreparable harm to Plaintiffs.

**COUNT III**
**(Defendants President Trump and Executive Office of the President)**
**Violation of the U.S. Constitution, Article I**
**IEEPA Violates the Vesting Clause (Nondelegation Doctrine)**

91.    Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

92.    Article I, Section 1 of the Constitution (the Vesting Clause) states that "All legislative powers herein granted shall be vested in a Congress of the United States … ."

93.    Article I, Section 8 of the Constitution states that "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises," Art. I, § 8, cl. 1 (Taxing and Spending Clause), and "[t]o regulate Commerce with foreign Nations." Art. I, § 8, cl. 3 (Foreign Commerce Clause).

94.    Congress "may not transfer to another branch 'powers which are strictly and exclusively legislative.'" *Gundy v. United States*, 588 U.S. 128, 135 (2019) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825)). *See also Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892) ("That [C]ongress cannot delegate legislative power to the president is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the [C]onstitution.").

95.    When Congress legislates, it must impose sufficient constraints on the Executive Branch's use of delegated authority. *Gundy*, 588 U.S. at 135-36. Congress can delegate power to another branch only if it "has supplied an intelligible principle to guide the deleg[at]ee's use of discretion." *Id*. at 135. Accord *FCC v. Consumers' Research*, Nos. 24–354 and 24–422, 2025 WL 177630, *8 (U.S. June 27, 2025) ("we have asked if Congress has provided sufficient standards to enable both 'the courts and the public [to] ascertain whether the agency' has followed the

law" (citing *OPP Cotton Mills, Inc. v. Administrator of Wage and Hour Div., Dept. of Labor*, 312 U.S. 126, 144 (1941))).

96.    If IEEPA does authorize the President to impose the tariff at issue in the Tariff Executive Orders, then IEEPA lacks an "intelligible principle" that constrains Executive Branch decision-making authority, *Gundy*, 588 U.S. at 135, and provides a publicly discernable standard, *Consumers' Research*, 2025 WL 177630, at *8. In that case, IEEPA is unconstitutional because it transfers core legislative powers to the President by permitting him to set tariffs and regulate commerce with foreign nations.

97.    Accordingly, if IEEPA is construed to allow tariffs, then it violates the intelligible principle requirement and violates the Vesting Clause, and the Tariff Executive Orders are unconstitutional. In that case, the HTSUS modifications made in reliance on the Tariff Executive Orders also are unlawful.

98.    The President's unconstitutional exercise of legislative power and the modifications to the HTSUS has caused and will continue to cause irreparable harm to Plaintiffs.

**COUNT IV**
**(Defendants Secretary Noem, Department of Homeland Security,**
**Commissioner Scott, U.S. Customs and Border Protection)**
**The Modifications to the HTSUS Violate the Administrative Procedure Act**

99.    Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

100.    The Administrative Procedure Act requires a reviewing court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C).

28

101. As pleaded above, the HTSUS modifications made to comply with Tariff Executive Orders are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C).

102. Accordingly, the HTSUS modifications must be vacated and set aside.

103. Defendants' APA violations have caused and will continue to cause ongoing irreparable harm to Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court grant the following relief:

A. A determination that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23.

B. Appointment of Plaintiffs as Class Representatives for their respective Classes and Plaintiffs' counsel as Class Counsel;

C. A declaratory judgment pursuant to 28 U.S.C. § 2201(a) declaring that the Tariff Executive Orders are unlawful and unconstitutional, either (1) because they are *ultra vires* as in excess of/not authorized by statute, or (2) because IEEPA violates the Constitution by failing to provide an intelligible principle constraining actions a president takes under that statute.

D. A declaratory judgment pursuant to 28 U.S.C. § 2201(a) declaring that, because the Tariff Executive Orders are unlawful, the resulting HTSUS modifications are unlawful and in violation of the Administrative Procedure Act.

E. Vacatur of all HTSUS modifications made to implement the Tariff Executive Orders, holding these modifications unlawful and setting them aside as per APA § 706.

F.    Permanent injunctive relief enjoining the Defendants Executive Office of the President, Noem, U.S. Department of Homeland Security, Scott, U.S. Customs and Border Protection, Bessent, U.S. Department of the Treasury, Lutnick, and U.S. Department of Commerce from implementing or enforcing the Tariff Executive Orders or the resulting modifications to the HTSUS, and from taking any other actions to implement or enforce those Executive Orders.

G.    An award to Plaintiffs of the costs of this action and reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

H.    Such other and relief as this Court may deem just and proper.

Dated this 4th day of November 2025.

Respectfully submitted,

*/s/ Kara M. Rollins*
Kara M. Rollins (DC Bar #1046799)
John J. Vecchione (DC Bar #431764)
Andrew J. Morris (DC Bar #411865)
Christian Clase (*admission pending*)
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive
Suite 300
Arlington, VA 22203
Tel: (202) 869-5210
Fax: (202) 869-5238
kara.rollins@ncla.legal
john.vecchione@ncla.legal
andrew.morris@ncla.legal
christian.clase@ncla.legal

*Counsel for Plaintiffs*